United States District Court for the
Northern District of California
(280 South 1st Street, San Jose, CA 95113)

| | |
|---|---|
| Ronald Satish Emrit, Plaintiff (Pro Se) <br><br> v. <br><br> Yahoo! Inc. & Verizon Communications, Inc., Defendants | **CV 13 5951** <br> C.A. No. _____ <br><br> NC <br><br> **FILED** <br> DEC 24 2013 <br> RICHARD W. WIEKING <br> CLERK, U.S. DISTRICT COURT <br> NORTHERN DISTRICT OF CALIFORNIA |

## COMPLAINT

COMES NOW, the plaintiff Ronald Satish Emrit, who is bringing forth this cause of action against the defendants alleging that they have committed egregious acts amounting to the dignitary tort referred to as the invasion of privacy in addition to the intentional tort widely referred to as the intentional infliction of emotional distress. The plaintiff is seeking a judgment in the amount of $400 million because the conduct of the defendants should "shock the conscience" of the court; this judgment amount of $400 million will include remedies in the form of punitive, compensatory, and treble damages in addition to actual, presumed, and special damages. Because the plaintiff has entered into a contract with both defendants, this judg-



ment amount will also be comprised of expectation, reliance, and restitution damages; liquidated damages may also be applicable, if they had been expressly mentioned in the contractual language binding the plaintiff and the two defendants.

## I.) NATURE OF THE CASE

1.) This cause of action alleges that the two defendants i.e. Yahoo! and Verizon, committed the tort of invasion of privacy by selling the plaintiff's personal account information to the National Security Agency (NSA) and perhaps the Federal Bureau of Investigation (FBI).

2.) On September 23, 2013, a journalist named Robert Lenzner wrote an article in Forbes Magazine, and the article was entitled, "AT&T, Verizon, Sprint Are Paid Cash by NSA For Your Private Communications."

3.) The plaintiff argues that this article should be admissible as conditionally and logically relevant evidence which is a hearsay exception pursuant to Federal Rules of Evidence (F.R.E.) Rule 803.

4.) More specifically, the article would qualify as a "learned treatise" exception to the hearsay rule and/

or a business records exception pursuant to the stare decisis of _Palmer v. Hoffman_ and _Johnson v. Lutz_.

5.) The plaintiff argues that the Best Evidence Rule or Original Document Rule (articulated in the Federal Rules of Evidence Rule 1002) is inapplicable because the plaintiff had accessed the article electronically after performing a Google search.

6.) As such, any copy of this Forbes article (written by Robert Lenzner) should be admissible into evidence because there is no original copy of this electronic article.

7.) In establishing the relevance of this article, it can be stated with substantial certainty that the article tends to prove the material fact that the defendants have facilitated the process of allowing the National Security Agency (NSA) to spy on the plaintiff's email accounts with first obtaining a warrant pursuant to the Foreign Intelligence Surveillance Act of 1978 (FISA).

8.) These FISA warrants must be obtained pursuant to 50 U.S.C. ch. 36 or Public Law 95-511, 92 Stat. 1783.

9.) These FISA warrants must also be accompa-



nied by National Security Letters (NSL's) which are usually drafted by the FBI.

10.) With regards to the relevance of the article, the fact that the NSA and FBI are spying on the plaintiff's email accounts (with Yahoo! and Verizon) would be less probable without the admissibility of the Forbes article as a "learned treatises" and/or business exception to the hearsay rule (citing _Palmer v. Hoffman_, supra, and _Johnson v. Lutz_, supra)

11.) The relevance of the Forbes article is also characterized by the fact that its probative value is not outweighed by its prejudicial effect.

12.) The magistrate judge and/or the judge assigned to this case could also take judicial notice of the content of this Forbes article since Forbes is a well-known and widely-recognized publication.

13.) The admissibility of the article would not lead to cumulative evidence, unfair surprise, confusion of the issues, undue delay, etc..

14.) In his article, Robert Lenzner states that the "National Security Agency pays AT&T, Verizon and Sprint several hundred million dollars a year



for access to 81% of all international phone calls into the US, according to a leaked inspector general's report, which has been reported by the Washington Post, AP, and the New York Review of Books."

15.) In his article, Robert Lenzner goes on to state, "In fact, this secret report says 'that "NSA maintains relationships with over 100 U.S companies, underscoring that the U/S. has the "home-field advantage" as the primary hub for worldwide communications," the New York Review of Books reported in its August 15 issue."

16.) Furthermore, Robert Lenzner states, in his Forbes article, that, "These secret cooperative agreements reveal that NSA pays surveillance fees to telcos and phone companies were first made, public by Edward Snowden, the former NSA administrator, now resident in Russia."

17.) The court can and should take judicial notice that Edward Snowden was the former NSA employee hired as an independent contractor through the firm Booz Allen Hamilton.

18.) It is alleged that Edward Snowden has committed treason specifically because he had disclosed



classified information to WikiLeaks and perhaps to Communist China and Russia.

19.) Because the FBI has limited international jurisdiction, it is presumed that the FBI is working together with Interpol and the International Criminal Court (ICC) and is religiously trying to use extradition treaties; this case also involves the application of political asylum laws.

20.) Citing the stare decisis/persuasive precedent of _Miller v. Albright_, a person can be granted political asylum if he or she has a "well-founded fear of perse-cution."

21.) With regards to the woman applying for political asylum in _Miller v. Albright_, she had a fear that the men in her country would be performing "female genital mutilation" (FGM) on her.

22.) Needless to say, this brutal, violent, and un-sanitary practice of FGM would definitely quali-fy any woman for being granted political asylum in the United States.

23.) In a similar fashion, any Cuban national who defects from Cuba and reaches the shores of South



Florida will be considered to be a "legal permanent resident" according to the Cuban Adjustment Act.

24.) The public policy of the Cuban Adjustment Act is undoubtedly to encourage Cubans to seek freedom from the Castro Regime by embarking on boats headed to South Florida (with the notable exception of the Mariel Boatlift).

25.) Of course, the court can also take judicial notice that the United States has not had diplomatic relations with Cuba since the regime of the dictator/potentate Fulgencio Bautista.

26.) The United States does not have an embassy and/or consulate in Cuba; rather there is a U.S. Interests Section at the Swiss Embassy in Havana.

27.) Likewise, the regime of Raul Castro has a Cuban Interests Section at the Swiss Embassy in Washington, D.C..

28.) Interestingly enough, Cuban nationals can leave Cuba if they receive a "carta de invitacion" or "letter of invitation" from citizens from other countries; this "letter of invitation" must be presented to Cuba's Ministry of Foreign Affairs.



29.) In order to travel to Cuba, Americans must first obtain a license from the Office of Foreign Assets Control (OFAC); OFAC is a political subdivision and/or branch of the U.S. Treasury Department.

30.) In addition to the more recently-enacted Torricelli Act, the Helms-Burton Act and the Trading-with-the-Enemy Act expressly forbid Americans from traveling to Cuba and spending money there by engaging in financial transactions with Cuban companies.

31.) Nevertheless, thousands of Americans travel illegally to Cuba every year by traveling to other countries first, such as Mexico, the Bahamas, Dominican Republic, etc.. Needless to say, the United States does not have any direct flights to Cuba for Americans that have not already first obtained a license from OFAC.

32.) It is the job of the United States Customs and Citizenship Immigration Service (CIS) to determine (at airports) whether or not Americans have traveled to Cuba without first obtaining a license from OFAC.

33.) Citizenship and Immigration Services (CIS) used to be the Immigration and Naturalization Service (INS) under the Cabinet level agency, i.e. the U.S. Department of Justice (DOJ).



34.) CIS has been moved to the U.S. Department of Homeland Security (from the U.S. Department of Justice)

35.) The United States Customs Service has been re-packaged as Immigrations and Customs Enforcement (ICE) which like CIS is also under the U.S. Dept. of Homeland Security.

36.) Needless to say, the court can take judicial notice that the Secretary of Homeland Security, is Janet Napolitano (the former Arizona governor) and the Attorney General is Eric Holder (who oversees the Department of Justice and all of its agencies).

37.) In continuing with Robert Lenzner's article (in Forbes magazine), he states that, "AT & T charges $325 for each activation fee and $10 a day to monitor the account, according to the AP. Verizon charges $775 per tapping for the first month and then $500 a month thereafter, according to the Associated Press today. The article reported that Microsoft (MSFT - 1.06%), Yahoo (YHOO + 0.35%) and Google refused to say how much they charged to allow the government to tap into emails and other non-telephonic communications."



38.) Robert Lenzner's article also goes on to state, "In a separate report the Washington Post reported that NSA pays the telcos roughly $300 million annually for access to information on their communications; where and when they occurred, the identity of the person called and how long the conversation lasted." This surveillance is accomplished by tapping into "high volume circuits and packet-switched networks." The ability to obtain this information was authorized by the US Communications Assistance for Law Enforcement Act, passed in 1994 by the Clinton administration."

39.) Finally, Robert Lenzner's article goes on to state, "While $300 million for giant telephone companies is only a slight fraction of their overall revenues, it is quite a shocking revelation to think that the telcos consumers pay every month to hook them up with the world are also being paid by the U.S. government to maintain watch over our daily communication whether over wired instruments or unwired communications equipment like I pads and cell phones. Snowden recently released information by means of a slide which revealed that the government "was able to access real-time-data on the live voice, text, e-mail, or internet chat services, in addition to analyzing stored data." (like your



Facebook account)"

40.) Although Edward Snowden is not being confronted with "female genital mutilation" (FGM) like the subject in the case of <u>Miller v. Albright</u>, supra, he may still have a "well-founded fear of persecution" if he is returned to the United States, where he would almost immediately be apprehended by the U.S. Marshals Service (USMS) and indicted and arraigned in a federal court (perhaps a FISA court).

41.) Interestingly enough, Edward Snowden seeks asylum from the United States which is usually the country that offers political asylum to political prisoners who have a "well-founded fear of persecution" from other countries, such as China, Cuba, Saudi Arabia, etc.

42.) The court should take judicial notice that the United States recently tried to get Roxana Saberi freed from Iran and the U.S. also tried to get the reporter Laura Ling freed from North Korea.

43.) Both Roxana Saberi (in Iran) and Laura Ling (in North Korea) had been accused of espionage in those respective countries; the United States was successful at having both Roxana Saberi and Laura

⑫

Ling freed from Iran and North Korea, respectively.

44.) To invoke the Socratic Method, the plaintiff in the present case at bar has to ask, "Where is the double standard?" If the United States worked so hard to get Roxana Saberi freed from Iran and Laura Ling freed from North Korea (both of whom were being obtained and/or apprehended because of baseless charges of espionage), then why is the United States trying so hard to persecute Edward Snowden because of his alleged acts of espionage and treason?

45.) If the United States criticized Iran and North Korea for detaining Roxana Saberi and Laura Ling, respectively, then why is the United States criticizing China and Russia for providing asylum to Edward Snowden for similar charges of espionage and treason?

46.) The court should take judicial notice that China offered a temporary safehaven to Edward Snowden, and refused to extradite Edward Snowden back to the United States.

47.) The court should also take judicial notice that Edward Snowden was given a safehaven for a significant amount of time at an airport in Russia; likewise, Russia also refused to extradite Edward

Snowden back to the United States.

48.) Previously, Edward Snowden had tried to be granted political asylum by Communist Cuba; however, the regime of Raul Castro refused to offer and/or extend political asylum to Edward Snowden.

49.) Edward Snowden had also sought refuge in Ecuador, at the suggestion of WikiLeaks editor-in-chief Julian Assange.

50.) Julian Assange himself has been subjected to a European Arrest Warrant in response to a Swedish police request for questioning in relation to a sexual assault investigation.

51.) Like Edward Snowden, the U.S. Dept. of Justice has also considered indicting and arraigning Julian Assange for his role in the leaking of classified information by Pfc. Bradley Manning (now Chelsea Manning).

52.) In an undated online article published by Slate Magazine, David Weigel writes about the former NSA director Keith Alexander testifying before the House Select Committee on Intelligence about the NSA's "domestic spying" program and the classi-



fied information leaked by Edward Snowden.

53.) The title of the article is "Trust but Terrify." Slate Magazine is owned by the Washington Post and Donald Graham of the Washington Post recently sold this publication to Amazon.com and its CEO Jeff Bezos. In a similar manner, AOL (of the conglomerate AOL Time Warner) recently purchased the Huffington Post, i.e. the only online publication to ever win the Pulitzer Prize.

54.) In the past, the NSA has engaged in egregious surveillance and "domestic spying" activities such as Project SHAMROCK and its sister project known as Project MINARET.

55.) The NSA relies heavily upon Signals Intelligence (SIGINT) although it also relies upon the Human Intelligence (HUMINT) provided by its secret operatives.

56.) With regards to Cuban-American policy, the Central Intelligence Agency (CIA) oversaw a program entitled "Operation Mongoose," i.e. a secret program designed to overthrow Fidel Castro before and after the "Bay of Pigs" invasion.

57.) As the 33rd ~~present~~ president who was ironically a 33rd degree Freemason, President Harry Truman started the Office of Strategic Services (OSS) in 1947; the OSS would later become CIA.

58.) Within CIA, the National Clandestine Service (NCS) was formerly the Directorate of Operations (DO).

59.) Valerie Plame worked as "Non-Official Cover" (NOC) within the National Clandestine Service (NCS) of CIA.

60.) In 2003, it had been reported by every major news media outlet that Lewis "Scooter" Libby had illegally disclosed that Valerie Plame was NOC for CIA.

61.) As the former Chief of Staff for Vice President, Richard "Dick" Cheney, Lewis "Scooter" Libby had been indicted for committing obstruction of justice.

62.) Strangely enough, the indictment of Scooter Libby did not charge him with treason and/or any felonies associated with revealing classified information.

63.) Scooter Libby had been successfully prosecuted by the appointed Special Counsel, i.e. U.S attorney

Patrick Fitzgerald

64.) Interestingly enough, Patrick Fitzgerald had also successfully prosecuted Governor Rod Blagojevich, i.e. the former governor of Illinois who was prosecuted for corruption and bribery as he was overheard on the phone offering Senator Barack Obama's Senate seat to the highest bidder.

65.) Although Lewis "Scooter Libby" had been successfully prosecuted by U.S. attorney Patrick Fitzgerald, President George W. Bush commuted the sentence of Lewis "Scooter" Libby.

66.) To invoke the Socratic Method once again, the plaintiff (in the present case at bar) has to ask, "Why is the NSA and the U.S. government trying to prosecute Edward Snowden for espionage and treason when President George W. Bush commuted the sentence of Lewis "Scooter Libby" who also committed treason by revealing that Valerie Plame was a NOC for CIA?"

67.) Nevertheless, the plaintiff (in the present case at bar) also asserts that David Weigel's article (published online by Slate Magazine) is also admissible into evidence as a "learned treat-

ises" and/or "business records" exception to the Hearsay Rule (citing _Palmer v. Hoffman_, supra, and _Johnson v. Lutz_, supra)

68.) The Slate article (by David Weigel) is both logically and conditionally relevant because it proves the material fact that NSA is engaging in a "domestic spying" program and that the defendants (Yahoo! Inc. and Verizon Communications) are being paid money by NSA for the private information of the accountholders of Yahoo! and Verizon email accounts.

69.) Unlike Yahoo!, Verizon Communications also provides wireless services and land-line ~~phos~~ phone services (for local calls and long-distance calls).

70.) As a result, it can be stated with substantial certainty that Verizon Communications has also provided NSA with private information associated with the telephone and cellphone records of its accountholders (making Verizon even more culpable than Yahoo!).

71.) Nevertheless, the plaintiff (in the present case at bar) would like to hold the defendants (Yahoo! and Verizon) jointly and severally liable for the requested judgment amount of $400 million.

72.) Because Yahoo! can exercise a "good faith argument" that it should not be held liable for the invasion of privacy committed by Verizon as Verizon continues to divulge personal and private telephone and cellphone records to NSA, Yahoo! can either file a cross-claim against its co-defendant Verizon and/or Yahoo! can seek contribution and indemnity from Verizon as its joint tortfeasor.

73.) The fact that NSA is engaging in a "domestic spying program" by obtaining the private records of the account-holders of Verizon and Yahoo! (the co-defendants in the present case at bar) would be less probable without the admissibility of the Slate/Washington Post article written by David Weigel.

74.) Therefore, the Slate article written by David Weigel is both logically and conditionally relevant and its probative value is not outweighed by its prejudicial effect.

75.) Moreover, the process of entering David Weigel's article (published by Slate) would not lead to a situation characterized by cumulative evidence, unfair surprise, confusion of the issues, undue delay, etc..

19

76.) Furthermore, the Best Evidence Rule/original Document Rule of F.R.E. 1002 is also inapplicable because David Weigel's article is an electronic document which can be read online.

77.) As a result of the electronic nature of David Weigel's article, there is no physical version of the original article written by David Weigel which could or would be submitted pursuant to F.R.E. 1002. (the same could be said of Robert Lenzner's article published by Forbes Magazine).

## II.) PARTIES TO THIS ACTION

78.) The plaintiff is an ~~te~~ unemployed, disabled, and indigent resident of the state of Rhode Island (in the city of Providence); the plaintiff had previous-ly been a resident of the state of Maryland in the cities of Bowie, MD and Silver Spring, MD. Neither of the defendants has its nerve center and/or principal place of business (ppb) in the state of Maryland and/or the state of Rhode Island. Because of the fact that this action is not being brought in the Superior Court of Rhode Island, it does not matter if either defendant has sufficient "minimum contacts" with the state of Rhode Island to invoke the "long-arm statute." Pursuant to the case-law of _Inter-_



national Shoe Co. v. Washington, 326 U.S. 310 (1945), it does not matter if Yahoo! and Verizon have "systemic and continuous contact" with the states of Rhode Island and Maryland. Pursuant to the stare decisis/persuasive precedent of <u>Asahi Metal Industry Co. v. Superior Court,</u> 480 U.S. 102 (1987), it does not matter whether or not the concept of traditional notions of fair play and substantial justice applies to either defendant. Nevertheless, the physical and mailing address of the plaintiff is 976 Douglas Avenue, Second Floor, Providence, RI 02908).

79.) The physical address/mailing address for the first defendant is 701 First Ave., Sunnyvale, CA 94089. As the first defendant, Yahoo! can be described as an Internet Service Provider (ISP) and technology company which is publicly traded on the stock exchange known as NASDAQ. The chief executive officer (CEO) of Yahoo! is Marissa Mayer. Because this case does not involve allegations of fraud, inadequate capitalization, and/or "alter ego," the plaintiff (in the present case at bar) is not trying to hold Marissa Meyer, the board of directors, shareholders, and/or other corporate officers personally liable through the doctrine of "piercing the corporate veil" (PCV). Because of the fact that the plaintiff is not a shareholder of Yahoo! or any

of its subsidiaries, the plaintiff is not bringing a stockholder derivative action or any other action alleging an interested director transaction, self-dealing, violation of the Business Judgment Rule, and/or violation of the Corporate Opportunity Doctrine (by usurping a corporate opportunity). There are also no allegations involving the invocation of the Sarbanes-Oxley Amendment of 2002, the Williams Act, "Deep Rock" Doctrine," Private Securities Litigation Reform Act (PSLRA), Uniform Securities Act of 1956, the National Market Securities Improvement Act (NSMIA), Revised Model Business Code Annotated (RMBCA), state "blue sky" laws, the Securities Act of 1933, and/or the Securities Exchange Act of 1934 (15 U.S.C. § ~~#~~ 78 and/or ~~C.F.R.~~ 17 C.F.R. 240)

80.) The second defendant, i.e. Verizon Communications, is a multi-billion dollar telecommunications company which is publicly-traded on NASDAQ as VZ (like Yahoo!). The corporate address for Verizon is 140 West Street in New York, NY 10007-2123. The corporate office of Verizon can be reached at (212) 395-1000. The customer service phone number for wireless services is 1-800-922-0204. The customer service for land line telephone customers is 1-800-294-6804. The CEO of Verizon is Lowell C.

McAdam. Once again, the plaintiff is not trying to "pierce the corporate veil" of Verizon nor does the plaintiff allege any violation of the federal securities laws and/or state "blue sky" laws. The plaintiff would like to point out that he met the former Verizon CEO at a conference held in Washington, D.C., The plaintiff had been attending the Verizon conference with his former promoters Thomas Hart, Esquire and Stanley "Skip" Kelly of On The Potomac Inc (OTP). Thomas Hart and Skip Kelly helped the plaintiff record the reggaeton song "La Reina Cubana" with Thomas Hart's tenant, ie. Patrick Hightower of Street Star Studios in Haymarket, VA.

## III.) JURISDICTION AND VENUE

81.) According to the Federal Rules of Civil Procedure (F.R.C.P.) 8(a)(1), the plaintiff is required to provide "a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;"

82.) Because the court does not already have personal or subject matter jurisdiction over this issue, it is necessary to engage in a brief discussion

about the court's jurisdiction so that the defendants cannot move to dismiss this case based on procedural grounds involving a lack of proper jurisdiction.

83.) Pursuant to U.S.C.A. §1332, the U.S. District Court for the Northern District of California (as an Article III court) has jurisdiction over this matter because there is full and complete diversity of jurisdiction between the plaintiff and the two co-defendants. There is diversity of jurisdiction because the plaintiff and the two co-defendants are from three different states. As had been mentioned earlier, the plaintiff is from the state of Rhode Island while the first co-defendant is from the state of California (in the jurisdiction of the U.S. District Court for the Northern District of California) and the second co-defendant is from the state of New York.

84.) In addition, a "federal question" arises out of a discussion of the invasion of privacy as it relates to the National Security Agency (NSA), Federal Bureau of Investigation (FBI), the issuance of FISA warrants, the issuance of National Security Letters (NSL's), and the enforcement of the Torricelli Act, Helms-Burton Act, and the Trading-with-the-Enemy Act. The present case at bar also invokes a discussion

of the Fourth Amendment right of privacy to be free from searches and seizures, "reasonable suspicion," and "probable cause," and perhaps the exclusionary rule, the fruit-of-the-poisonous-tree doctrine, and/or the attenuation doctrine and rule of independent discovery.

85.) As a result of the invocation of the aforementioned issues, the U.S. District Court for the Northern District of California has personal, subject matter, exclusive, and original jurisdiction. Pursuant to 28 U.S.C. § 1391, venue is also proper in the U.S. District Court for the Northern District of California.

## IV.) STATEMENT OF FACTS

86) On or around the summer of 2002, the plaintiff officially applied for a job as a clandestine operative with CIA based in Langley, VA.

87.) Around this time, the plaintiff also applied for a job online with the FBI at http://www.fbijobs.com

88.) More specifically, the plaintiff applied to be an intelligence analyst and/or Special Agent

with the FBI (in which the plaintiff would have had to train in Quantico, VA which is also the headquarters of the United States Marine Corps (USMC).

89.) In 1997, the plaintiff saw one of his best friends, i.e. Henry "Hank" Brown of Scottsdale, AZ, graduate from "boot camp" as a marine in Parris Island, SC.

90.) Henry "Hank" Brown would later go on to 29 Palms, CA and would ultimately be stationed in Japan.

91.) With regards to employment with the FBI, the plaintiff spoke with Andrea Kalucci at the North Miami Beach field office of the FBI.

92.) In 2004, the plaintiff also spoke with Kal Wong of the Honolulu, HI field office of the FBI (about possible employment with the FBI); Special Agent Kal Wong ultimately mailed a physical application (as opposed to an online electronic application) to the plaintiff's home address which at that time was in Silver Spring, MD.

93.) In December of 2003, the plaintiff also

spoke with "Faye" at CIA about possibly being employed by this particular intelligence agency.

94.) When the plaintiff spoke with "Faye" at CIA, he was driving on his way to downtown Washington, D.C. to attend a Barbri bar review course preparing law school graduates and lawyers (licensed in other jurisdictions that have no reciprocity with Maryland) for the February, 2004 Maryland bar examination to be administered at Martin's Crosswinds in Green-belt, M.D.

95.) The plaintiff would ultimately fail the February, 2004 bar exam in Maryland; he had previously failed the February, 2003 Arizona administered in Mesa, AZ; he would later fail the July, 2004 Florida bar exam and the February, 2005 bar exam both of which were administered at the Tampa Convention Center around Ybor City in Tampa, FL.

96.) The plaintiff made an attempt to take the July, 2011 bar exam administered by the Washington State Bar Association (WSBA) in Seattle, WA.

97.) With regards to the July, 2011 bar exam, the plaintiff communicated with Gus Quiniones, Jean McElroy, and Alvin Littles, all of whom are em-

ployees for the WSBA.

98.) The plaintiff filed a lawsuit against the WS BA at the U.S. District Court for the Western District of Washington because the WSBA employees allegedly violated the Americans with Disabilities Act (ADA) by failing to make accommodations for the plaintiff who suffers from bipolar disorder/manic depression.

99.) The WSBA did not allow the plaintiff to sit for and take the July, 2011 because the WSBA claimed that the plaintiff needed a hearing because his bar exam application was incomplete.

100.) The WSBA claimed that the plaintiff's bar exam application was incomplete because it was missing court documents relative to the plaintiff's divorce (in 2006) from Sabine Jules of Fort Lauderdale, FL.

101.) Nevertheless, the plaintiff filed an articles of incorporation for an S Corporation called Alex Garcia Enterprises, Inc (AGE) in 2003 while the plaintiff was attending an MBA program at the University of Arkansas Walton College of Business in Fayetteville, AR (not far from the

(28)

corporate headquarters of Walmart in Bentonville, AR). This region of NW Arkansas is also the principal place of business (pp b) for Tyson foods.

102.) To elaborate, the plaintiff attempted to sub-contract with CIA (by submitting the paperwork to CIA for Alex Garcia Enterprises, Inc. (AGE))

103.) The plaintiff has never officially been offered a position with CIA or the FBI (in any field office).

104.) However, the plaintiff believes in "good faith" that he is an "intelligence subject" with CIA because of the fact that he expressed an interest with Project MK Ultra administered by CIA.

105.) Pursuant to the stare decisis/persuasive precedent of _Snepp v. United States_, a constructive trust was imposed when a former CIA agent sought to make profits by publishing a book about his years of employment at CIA.

106.) CIA won this case because the intelligence agency successfully argued that Frank Snepp had violated his non-disclosure agreement with the agency and even President Jimmy Carter at the time argued that Snepp did not qualify as a "whistleblower" and

that his actions threatened the national security of the United States by portraying a breakdown in discipline at CIA.

107.) In the present case at bar, the stare decisis/persuasive precedent of _Snepp v. United States_, supra, does not apply because CIA never officially offered the plaintiff a position of employment to the plaintiff.

108.) Nevertheless, the plaintiff was able to submit his subcontractor paperwork to CIA for his start-up venture, i.e. Alex Garcia Enterprises, Inc, (AGE), without first obtaining a Dunn and Bradstreet Number or registering with Central Contractor Registration (CCR).

109.) The plaintiff's start-up venture would have also qualified for opportunities in HUB zones provided by FedBizOpps by communicating with liaison officers at CIA Office of Small and Disadvantaged Business Utilization (OSDBU).

110.) In 2009, the plaintiff also applied for a position of employment with the National Security Agency (NSA) which is based in Fort Meade, MD.



111.) More specifically, the plaintiff applied for several positions with the NSA online at the Jacaranda Library in Venice, FL.

112.) In August of 1999, the plaintiff traveled to Santiago de Cuba, Cuba with his friend Damon Ford.

113.) The plaintiff and his friend stayed at the Casa Granda Hotel in Santiago de Cuba and met with Rachel Barreiro Garcia (a medical student from Las Tunas, Cuba in "el oriente") and her best friend Marena Linares.

114.) Rachel Garcia was the "love interest" of the plaintiff while Marena Linares was the love interest of the plaintiff's friend, i.e. Damon Ford.

115.) Currently, Rachel Garcia lives in Barcelona, Spain while her friend Marena also lives in Spain (after years of living with her ex-husband in Italy).

116.) Because the plaintiff and his friend Damon Ford have never officially been offered positions of employment with CIA, Rachel Garcia and her friend Marena Linares are not be misconstrued as



"CIA assets" although there is the distinct possibility that Rachel Garcia and Marena Linares may be "intelligence subjects" with CIA.

117.) In addition, the plaintiff had another friend from Holguin, Cuba ("el oriente"); her name is Magna Gargallo Perez and she was a "political prisoner" because she was jailed by the regime of Fidel Castro (for trying to practice Christianity).

118.) Because of the fact that Magna Gargallo Perez was a "political prisoner" in Cuba (for trying to practice Christianity), the plaintiff tried to get a "letter of invitation" (carta de invitación) for her and/or political asylum because she had a "well-founded fear of persecution" from the Castro regime (pursuant to the stare decisis/case-law of _Miller v. Albright_, supra)

119.) Likewise, Magna Gargallo Perez is also not a "CIA asset" although she may be an "intelligence subject" with CIA.

## V.) COUNT ONE : INVASION OF PRIVACY

120.) The plaintiff alleges that both co-defendants have committed the dignitary tort of "invasion of



privacy" and particularly intrusion upon seclusion.

121.) To establish a prima facie of "intrusion upon seclusion," the plaintiff must prove the following elements:

A.) Invasion of a secluded place or privacy: the Defendants must invade the plaintiff's personal or private space. The definition of this invasion is very broad. Invasion may be:

    i.) by physical intrusion into a place where the plaintiff has secluded himself or herself

    ii.) by use of the Defendants' senses to over-see or overhear the plaintiff's private affairs (such as eavesdropping or spying with a telescope), or

    iii.) some other form of investigation or examination into plaintiff's private concerns (such as illegally obtaining someone's credit report).

B.) <u>Objectionable intrusion</u>: the intrusion must be of a type that would be highly offensive to

the ordinary reasonable person.

C.) Invasion of private affairs or matters: the interference with the plaintiff's privacy must be substantial (however, if the event reported occurs in public, there is no expectation of privacy).

122.) Examples of intrusion upon privacy include placing microphones or cameras in someone's bedroom or hacking into their computer.

123.) In the present case at bar, the plaintiff contacted the Freedom of Information Act (FOIA) Office at NSA; the telephone number for this office is (301) 688-6527.

124.) In addition, the plaintiff had contacted the NSA National Cryptologic Museum at (301) 688-5849.

125.) The plaintiff also contacted the NSA Cryptologic School at (410) 854-6334.

126.) The plaintiff also contacted the NSA Public and Media Affairs office at (301) 688-6524.

127.) With regards to each inquiry, the plaintiff had indicated that he had to type in a Capcha Code (allegedly designed by Alan Turing who deciphered the Nazi Code referred to as ENIGMA) almost every time that he had sent out an email from his Yahoo! account with the email address of wilburlovescharlotte@yahoo.com.

128.) The plaintiff had informed each NSA office (that he contacted) that he considered the Capcha Code requirement to be a serious invasion of privacy because this process indicates that government employees and Yahoo! technicians are monitoring and spying on the plaintiff's Yahoo! account.

129.) Without "probable cause" and/or "reasonable suspicion" to issue a "National Security Letter" (NSL) with regards to the plaintiff's Yahoo! account, neither the FBI nor the NSA has the authority to spy on and/or monitor the plaintiff's Yahoo! account (notwithstanding the fact that the plaintiff may be characterized as an "intelligence subject" with CIA.

130.) Without "probable cause" and/or "reasonable suspicion" to obtain a FISA warrant, neither the FBI nor the NSA has the authority to spy on

and/or monitor the plaintiff's Yahoo! account or Verizon account (notwithstanding the fact that the plaintiff may be characterized as an "intelligence subject" with CIA).

131.) In addition, the fact that the plaintiff travelled to Cuba (in August 1999) and had Cuban penpals (i.e. Rachel Barreiro Garcia, Marena Linares, and Magna Gargallo Perez) does not give the FBI and/or NSA "reasonable suspicion" and/or "probable cause" to spy on and/or monitor the plaintiff's email accounts with Yahoo! and Verizon (notwithstanding the possibility that Rachel Garcia, Marena Linares, and Magna Perez may have been "intelligence subjects" and/or "assets" with CIA.

132.) With regards to ~~inclusion~~ intrusion upon seclusion, it can be stated with substantial certainty that both Yahoo! and Verizon satisfied the first prong of this dignitary tort because both of the defendants investigated or examined into the plaintiff's private concerns by illegally selling the plaintiff's private information to the NSA and/or FBI (without first obtaining a FISA warrant and/or issuing a National Security Letter (NSL)).

133.) The intrusion is objectionable because the ordin-



ary reasonable person would not want to have their personal information (associated with email accounts) sold and/or traded to federal law enforcement and intelligence agencies.

134.) As for the final prong/element to establish intrusion upon seclusion, the interference with the plaintiff's privacy (by the defendants Yahoo! and Verizon) is substantial because the NSA and FBI are law enforcement and intelligence agencies which usually conduct criminal investigations associated with espionage, treason, and terrorism.

## VI.) COUNT TWO: INTENTIONAL IN-FLICTION OF EMOTIONAL DISTRESS

135.) In order to prove a prima facie for the intentional infliction of emotional distress, the following prongs/elements must be proved:

A.) The defendants acted intentionally or recklessly; and

B.) The defendants' conduct was extreme and outrageous; and

C.) The defendants' act is the cause of the distress; and

D.) The plaintiff suffers severe emotional distress as a result of the defendants' conduct.

136.) In the present case at bar, both Yahoo! and Verizon acted intentionally and recklessly by selling the plaintiff's personal and private email account information to the NSA without a FISA warrant and/or National Security Letter (NSL).

137.) As for the second prong/element, the conduct of Yahoo! and Verizon (both co-defendants) is extreme and outrageous because the average Internet Service Provider (ISP) and/or provider of free email services (as with Yahoo! because it provides free email services to the plaintiff in the present case at bar) is supposed to safeguard and protect the private information of the accountholders (even if the email service is provided for free); nonetheless, it is egregious, extreme, and outrageous that both Yahoo! and Verizon sold the plaintiff's personal and private information to the NSA and FBI.

138.) The plaintiff experienced distress because

his bipolar disorder/manic depression was exacerbated by his legitimate concern, anxiety, and paranoia that both co-defendants had been selling his personal and private information to the NSA and FBI without the issuance of a FISA warrant and/or a National Security Letter (NSL). Needless to say, the conduct of both, Yahoo! and Verizon is the proximate cause and causation-in-fact of the plaintiff's emotional distress (although this type of causation analysis is traditionally reserved for a negligence analysis.

139.) As for the fourth prong, it has already been established that the plaintiff suffered severe emotional distress as a result of the conduct by Yahoo! and Verizon (both co-defendants). The plaintiff's bipolar disorder/manic depression was exacerbated because of the fact that both co-defendants (Yahoo! and Verizon) shared the plaintiff's personal and private information with the NSA and FBI, i.e. two intelligence and law enforcement agencies which must first obtain a FISA warrant and/or National Security Letter (NSL) before they spy on and/or monitor the email addresses and phones of accountholders with Yahoo! and Verizon.

(39)

140.) Because the test for the intentional infliction of emotional distress is a conjunctive test (as opposed to a disjunctive test), all four prongs/elements of the test must be satisfied in order to establish a prima facie case.

141.) The plaintiff has provided an extensive, thorough, and comprehensive analysis to satisfy all four prongs of the conjunctive test. In essence, both Yahoo! and Verizon have committed the intentional infliction of emotional distress by selling the plaintiff's personal and private email account and phone information to the NSA and FBI, i.e. two law enforcement and intelligence agencies which must first obtain a FISA warrant and/or National Security Letter (NSL) before they spy on and/or monitor the accountholders of Yahoo! and Verizon accounts.

## VII.) COUNT THREE: BREACH OF CONTRACT

142.) Not every term of the contract must be taken literally. Only a breach of contract which subtracts value from the non-breaching party can warrant a lawsuit. Such suits are considered material breaches.

143.) Breaches of contract that do not take away



value from agreement are considered minor breaches and are highly unlikely to succeed as a lawsuit.

144.) A fundamental breach is a breach which breaks a fundamental aspect of the agreement, an aspect so important that the wronged party can terminate the fulfillment of the contract.

145.) An anticipatory breach is a breach where the wronged party has every reason to suspect that a breach will occur, even if one hasn't happened yet.

146.) To prove that there is and was an enforceable contract, the plaintiff must establish the three elements of offer, acceptance, and consideration.

147.) An offer is defined as a commitment to an identifiable offeree with certainty and definiteness of terms

147.) To establish consideration, there must be the existence of a legal detriment and bargained-for exchange.

148.) The consideration must be sufficient enough to satisfy the Peppercorn Theory of Consideration; oral contracts are enforceable if they are not



expressly forbidden by the Statute of Frauds and/or the parol evidence rule.

149.) Acceptance must abide by the Mirror Image Rule and/or the Mailbox Rule. A sales contract between two merchants must abide by the Uniform Commercial Code (UCC) 2-207, i.e. the "Battle of the Forms."

150.) According to the "Battle of the Forms," an acceptance, which does not materially alter the express and constructive terms of the contract is considered to be a valid acceptance.

151.) In the present case at bar, both Yahoo! and Verizon committed a fundamental breach of contract by selling the plaintiff's personal and private email and phone account information to the NSA and/or FBI whereby both of these federal agencies were or are required to first obtain a FISA warrant and/or National Security Letter before they spy on and/or monitor the email and phone records of any American (including the plaintiff who is an American citizen by both the principles of jus soli and jus sanguinis because the plaintiff was born in American (in Boston, MA) and both of his parents are American.



152.) In fact, the plaintiff's father (Ronald C. Emnit) had a security clearance and worked for over 20 years as a nuclear engineer with the Nuclear Regulatory Commission (NRC) with his good friends Khalid Shaukat, Brad Harding and the late Bart Buckley.

153.) For a good portion of his career, the plaintiff's father worked for NRC director Shirley Jackson, i.e. the current president of Rensselear University in Albany, NY.

154.) The former NRC director (Shirley Jackson) was a former mathematics student of the plaintiff's grandmother (Marie Moss Smith) at Theodore Roosevelt High School in NW Washington, D.C.,

155.) Shirley Jackson is also a member of the Council on Foreign Relations (CFR) which has often been described as "American Illuminati" as has the Bilderberg Group, Bohemian Grove, the Tri-Lateral Commission, United Nations, World Bank, International Monetary Fund (IMF), and/or other supranational organizations.

156.) In December of 2005, Shirley Jackson delivered the eulogy at the funeral of the plaintiff's



grandmother (Marie Moss Smith) at Christ the King church in Bethesda, MD; the plaintiff's grandmother is buried at Mount Olivet Cemetery off of Bladensburg Road in NE Washington, D.C.,

157.) The plaintiff's aunt is Patricia Bransford, who runs a non-profit 501(c)(3) agency called Urbantech, Inc. which is based in New York, NY.

158.) Pat Bransford is a good friend of Justice Barrington Daniels Parker who is an appellate judge for the Second Circuit Court of Appeals at 40 Foley Square in New York, NY; Pat Bransford and her husband, Thomas Bransford (a Marine who has also worked for IBM) are also good friends with the famous actor Warren Beatty.

159.) Similar to the former NRC director Shirley Jackson, Justice Barrington D. Parker is also a member of the Council on Foreign Relations, i.e. an organization of which CNN anchor Erin Burnett is also a member.

160.) Nevertheless, the present case at bar involves a fundamental breach of contract because the "right to privacy" is an express or constructive condition of any contract involving Internet Service Providers

(ISP's) and/or the providers of free email service (as with the defendant Yahoo!) or the providers of wireless services and/or land-line phone services (as with the co-defendant Verizon Communications).

161.) As a logical extension, Yahoo! and Verizon committed a "fundamental breach of contract" by selling the plaintiff's personal and private account information to the NSA and/or FBI without first requiring that the NSA and/or FBI obtain a FISA warrant and/or National Security Letter (NSL).

162.) Needless to say, the contract is enforceable and valid because there is fully-binding offer, acceptance, and consideration between the plaintiff and the two defendants, i.e. Yahoo! and Verizon.

163.) More specifically, Verizon offered a bundled package of landline phone, cable TV, and internet service to the plaintiff; the plaintiff accepted Verizon's offer and there is consideration, because the plaintiff pays Verizon approximately $250 per month for Verizon's service.

164.) Likewise, Yahoo! offered to provide free internet service to the plaintiff and the plaintiff accept-

ed Yahoo.!'s offer by setting up his own personal email account at wilburloveschaylotte@yahoo.com. The plaintiff entered personal and privileged information as he set up his Yahoo! email account.

165.) There is and was consideration in the plaintiff's contract with Yahoo! (even though Yahoo! provides free email service) because the plaintiff had impliedly agreed to visit the websites of companies advertising on the website of Yahoo! (since the companies advertising on Yahoo! are the clients of Yahoo! paying Yahoo! to place advertisements on its website).

166.) There is also consideration in the plaintiff's contract with Yahoo! because it is implied that the plaintiff agrees to read the articles of the journalists who work for Yahoo.!.

## VIII.) PRAYER FOR RELIEF

~~#67~~ WHEREFORE, the plaintiff has filed this complaint alleging that both co-defendants (i.e. Yahoo! and Verizon Communications) have committed tortious actions associated with the dignitary tort of invasion of privacy (and particularly "intrusion upon seclusion") and the intentional tort widely referred

46

to as the intentional infliction of emotional distress. In addition, the plaintiff has alleged that both co-defendants have committed a fundamental breach of contract by violating the plaintiff's "right to privacy", and essentially selling the plaintiff's personal and ~~private~~ private information to the NSA and FBI without first obtaining a FISA warrant and/or National Security Letter (NSL). In filing this complaint, the plaintiff is requesting that the court provide him with the following remedies at law and/or equity:

A.) A judgment in the amount of $400 million which would be in the form of punitive, compensatory, actual, presumed, special, and treble damages associated with the commission of the torts of invasion of privacy (intrusion upon seclusion) and the intentional infliction of emotional distress (by Yahoo! and Verizon Communications as both co-defendants).

B.) This proposed judgment amount of $400 million, would also encompass expectation, reliance, and restitution damages associated with a fundamental breach of contract as Yahoo! and Verizon both breached the plaintiff's right to privacy by divulging personal information of the plaintiff to the NSA and FBI without first requiring these agencies to obtain a

FISA warrant and National Security Letter (NSL) As a law school graduate, the plaintiff understands that punitive damages are not appropriate in contract actions (alleging a breach of contract) although the plaintiff asserts that he is entitled to punitive and treble damages because of the fact that both co-defendants have committed the torts of invasion of privacy and the intentional infliction of emotional distress.

C.) The plaintiff asserts that liquidated damages may also be applicable since the plaintiff has entered into two separate contracts, i.e. one contract with Yahoo! and one contract with Verizon Communications.

D.) The plaintiff is also seeking the equitable remedy of specific performance and/or an injunction mandating that both Yahoo! and Verizon honor the "right to privacy" as an express or constructive condition of the plaintiff's contracts with both co-defendants. By honoring the "right to privacy" provision in the plaintiff's contract with both co-defendants, each co-defendant agrees not to divulge the plaintiff's personal and private information to the NSA and/or FBI without first requiring each one of these federal agencies to obtain a FISA warrant and

(48)

National Security Letter (NSL)

Respectfully submitted,

Ronald Satish Emrit

Ronald Satish Emrit
976 Douglas Ave., 2nd Floor
Providence RI  02908
(401) 272-0547
wilburloveschardotte@yahoo.com
ronaldemrit@verizon.net

Ronald Satish Emrit
Name and Address
976 Douglas Ave., 2nd Floor
Providence, RI 02908

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

Ronald Satish Emrit
**Plaintiff / Petitioner**

VS.

Yahoo! Inc. and
Verizon Communications
**Defendant / Respondent**

)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No.** _____

**Document Name:**

Complaint
_____
_____
_____

Case 4:13-cv-05951-SBA    Document 1    Filed 12/24/13    Page 50 of 50

Ronald Satish Emrit
976 Douglas Ave., 2nd Floor
Providence, RI 02908

new case

RECEIVED f.y.

DEC 23 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Attn: Mr. Richard W. Wieking
Clerk of the Court
Office of the Clerk
United States District Court
450 Golden Gate Avenue
San Francisco, CA 94102-3

U.S. MARSHAL
DEC 23 2013
INSPECT